1  Cheryl A. Williams (Cal. Bar No. 193532)
   Kevin M. Cochrane (Cal. Bar No. 255266)
2  caw@williamscochrane.com
   kmc@williamscochrane.com
3  WILLIAMS & COCHRANE, LLP
   125 S. Highway 101
4  Solana Beach, CA 92075
   Telephone: (619) 793-4809
5

6  Attorneys for Petitioner
   WILLIAMS & COCHRANE, LLP
7

8              **IN THE UNITED STATES DISTRICT COURT**

9            **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11  **WILLIAMS & COCHRANE, LLP**;          Misc. Case No.: _____

12            Petitioner,                  Arising from *Williams & Cochrane,*
                                           *LLP v. Quechan Tribe of Fort Yuma*
13            vs.                          *Indian Reservation et al.,* No. 17-CV-
                                           01436 GPC MSB (S.D. Cal. filed on
14                                         July 17, 2017)
    **CALIFORNIA STATE ARCHIVES**;
15  *and* **CALIFORNIA DEPARTMENT OF**     **POINTS AND AUTHORITIES IN**
    **JUSTICE**;                          **SUPPORT OF WILLIAMS &**
16                                         **COCHRANE'S MOTION TO**
              Respondents.                 **COMPEL COMPLIANCE WITH**
17                                         **SUBPOENAS TO PRODUCE**
                                           **DOCUMENTS TO NON-PARTIES**
18                                         **CALIFORNIA STATE ARCHIVES**
                                           **AND CALIFORNIA DEPART-**
19                                         **MENT OF JUSTICE, PURSUANT**
                                           **TO FEDERAL RULE OF CIVIL**
20                                         **PROCEDURE 45**

21

22

23

24

25

26

27

28
                                        Misc. Case No.: _____
    MOT. TO COMPEL SUBPOENA COMPLIANCE (CAL. STATE ARCHIVES & DOJ)

# TABLE OF CONTENTS

SUMMARY OF REQUEST ……………………………………………………...1

INTRODUCTION…………………………………………………………………… 1

STATEMENT OF FACTS ……………………………………………………….6

LEGAL STANDARD ………………………………………………………… 15

ARGUMENT ………………………………………………………………...16

I.     THE DEPARTMENT OF JUSTICE AND STATE ARCHIVES WAIVE PRIV-
       ILEGE BY THE VAGUE MANNER IN WHICH THEY STATED PRIVILEGE
       AND CONFIDENCE OBJECTIONS IN THEIR RESPONSES TO THE SUB-
       POENA REQUESTS ………………………………………………… 16

II.    THE STATE HAS FURTHER WAIVED PRIVILEGE BY ITS CONSIDER-
       ABLE INVOLVEMENT IN THE UNDERLYING LITIGATION, INCLUDING
       ITS SUBMISSION OF A 636 PAGE DECLARATION REGARDING ITS
       PERCEPTIONS OF THE QUECHAN COMPACT NEGOTIATIONS, AND ITS
       ASSISTANCE IN ARRANGING THE DEPOSITIONS OF TWO KEY WIT-
       NESSES WHO INTEND TO TESTIFY EVEN FURTHER ON THIS MATTER
       IN THE NEAR FUTURE ………………………………………………... 20

       A.     MAKING VOLUNTARY DISCLOSURES TO COUNSEL FOR THE
              DEFENDANTS ………………………………………………… 20

       B.     PUTTING A MYRIAD OF SUBJECTS AT ISSUE IN THE STATE'S
              NEGOTIATOR'S 636 PAGE DECLARATION ………………………...21

       C.     SCHEDULING SENIOR ASSISTANT ATTORNEY GENERAL
              SARA DRAKE TO TESTIFY AT THE IMPENDING JUNE 3,
              2020 DEPOSITION …………………………………………………...22

III.   THE STATE-LAW STATUTORY PROTECTION AFFORDED TO THE
       FILES OF OUTGOING GOVERNORS IN SECTION 6268 OF THE CAL-
       IFORNIA GOVERNMENT CODE IS NOT MEANT TO APPLY IN LITI-
       GATION OF ANY NATURE, LET ALONE FEDERAL QUESTION LITIGA-
       TION …………………………………………………………… 23

IV.   THE STATE HAS A LONG TRACK-RECORD OF FILING LENGTHY DEC-
LARATIONS FROM COMPACT NEGOTIATORS IN INDIAN GAMING CASES
WHILE CONCURRENTLY TRYING TO SHIELD THE UNDERLYING MA-
TERIALS FROM DISCOVERY …………………………………………………...24

CONCLUSION ………………………………………………………………………….25

# TABLE OF AUTHORITIES

**CASES**

*A&F Bahamas, LLC v. World Venture Group, Inc.,*
  2018 U.S. Dist. Lexis 224399 (C.D. Cal. 2018) …………………………………16

*Agster v. Maricopa County,*
  422 F.3d 836 (9th Cir. 2005) ……………………………………………………24

*Aclara Biosceinces v. Caliper Techs. Corp.,*
  2000 U.S. Dist. Lexis 10585 (N.D. Cal. 2000) ……………………………… 20

*Am. Fed'n of Musicians v. Skodamn Films, LLC,*
  313 F.R.D. 39 (N.D. Tex. 2015) …………………………………15, 16, 17

*Boston Sci. Corp. v. Lee,*
  2014 U.S. Dist. Lexis 107584 (N.D. Cal. 2014) …………………………... 18

*Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California,*
  618 F.3d 1066 (9th Cir. 2010) …………………………………………………7, 8

*Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California,*
  No. 04-02265 FCD KJN (E.D. Cal. 2010) …………………………………… 25

*Ctr. for Indiv. Rights v. Chevaldina,*
  2017 U.S. Dist. Lexis 195871 (S.D. Fla. 2017) …………………………...16, 17

*Ceuric v. Tier One, LLC,*
  325 F.R.D. 558 (W.D. Pa. 2018) ……………………………………………... 16

*Consumer Elec. Ass'n v. Compras And Buys Magazine, Inc.,*
  2008 U.S. Dist. Lexis 80465 (S.D. Fla. 2008) …………………………...5, 18

*Duplantier v. Bisso Marine Co.,*
  2011 U.S. Dist. Lexis 70548 (E.D. La. 2011) …………………………... 15

*Forsythe v. Brown,*
  281 F.R.D. 577 (D. Nev. 2012) …………………………………………………15

///

*Guzman v. Irmadan, Inc.,*
    249 F.R.D. 399 (S.D. Fla. 2008) ……………………………………… 16, 17

*Handgards, Inc. v. Johnson & Johnson,*
    413 F. Supp. 926 (N.D. Cal. 1976) …………………………………………22

*Heilman v. Vojkufka,*
    2011 U.S. Dist. Lexis 26004 (E.D. Cal. 2011) ………………………………..18

*Herrera v. AllianceOne Receivable Mgmt.,*
    2016 U.S. Dist. Lexis 40474 (S.D. Cal. 2016) …………………………………… 5

*Isenberg v. Chase Bank USA, N.A.,*
    661 F. Supp. 2d 627 (N.D. Tex. 2009) ………………………………………..15

*Leasure v. Willmark Cmtys., Inc.,*
    2012 U.S. Dist. Lexis 136445 (S.D. Cal. 2012) ……………………………… 20

*Marylander v. Superior Court,*
    81 Cal. App. 4th 1119 (2d Dist. 2000) ………………………………………..24

*MetroPCS v. Thomas,*
    327 F.R.D. 600 (N.D. Tex. 2018) …………………………………………15, 16

*Moon v. SCP Pool Corp.,*
    232 F.R.D. 633 (C.D. Cal. 2005) …………………………………………...15

*Orix USA Corp. v. Armentrout,*
    2016 U.S. Dist. Lexis 100617 (N.D. Tex. 2016) ………………………………...17

*Ott v. City of Milwaukee,*
    682 F.3d 552 (7th Cir. 2012) …………………………………………………17

*Panola Land Buyers Ass'n v. Shurman,*
    762 F.2d 1550 (11th Cir. 1985) ………………………………………………17

*Pauma Band of Luiseno Mission Indians v. California,*
    813 F.3d 1155 (9th Cir. 2015) …………………………………………… 1, 8

*Pauma Band of Luiseno Mission Indians v. California,*
    No. 09-01955 CAB MDD (S.D. Cal. 2017) ………………………………..8, 25

iv          Misc. Case No.: _____

MOT. TO COMPEL SUBPOENA COMPLIANCE (CAL. STATE ARCHIVES & DOJ)

*Rincon Band of Luiseno Mission Indians v. Schwarzenegger,*
    602 F.3d 1019 (9th Cir. 2010) ……………………………………………… 7

*Shepherd v. Superior Court,*
    17 Cal. 3d 107 (1976) ………………………………………………… 24

*Sherwin-Williams Co. v. JB Collins Servs.,*
    2014 U.S. Dist. Lexis 93368 (S.D. Cal. 2014) ………………………….. 18

*Shooker v. Superior Court,*
    111 Cal. App. 4th 923 (2d Dist. 2003) …………………………………. 22

*Tornay v. United States,*
    840 F.2d 1424 (9th Cir. 1988) ………………………………………... 20

*Total Rx Case, LLC v. Great N. Ins. Co.,*
    318 F.R.D. 587 (N.D. Tex. 2017) …………………………………………..17

*United States v. Blizerian,*
    926 F.2d 1285 (2d Cir. 1991) ………………………………………… 21

*Wallis v. Centennial Ins. Co.,*
    2013 U.S. Dist. Lexis 14181 (E.D. Cal. 2013) …………………………..18

*Walters Wholesale Elec. Co. v. Nat'l Union Fire Ins. Co.,*
    247 F.R.D. 593 (C.D. Cal. 2008) ……………………………………...21

*Weil v. Investment / Indicators,*
    647 F.2d 18 (9th Cir. 1981) ………………………………………….. 20

*Wm. T. Thompson Co. v. Gen. Nutrition Corp.,*
    671 F.2d 100 (3d Cir. 1982) …………………………………………… 24

*Williams & Cochrane, LLP v. Quechan Tribe et al.,*
    No. 17-01436 GPC MSB (S.D. Cal. filed on July 17, 2017) …………….*passim*

**STATUTES**

Indian Gaming Regulatory Act (25 U.S.C. § 2701 *et seq.*)
    *generally* ……………………………………………………….. 1, 6, 8
    § 2710(d)(1)(C) …………………………………………………... 6

Misc. Case No.: _____
MOT. TO COMPEL SUBPOENA COMPLIANCE (CAL. STATE ARCHIVES & DOJ)

§ 2710(d)(4) ………………………………………………………………6

Lanham Act (15 U.S.C. § 1051 *et seq.*)
  *generally* ……………………………………………………… 2, 10

California Government Code
  § 6260 …………………………………………………………… 24
  § 6268 ……………………………………………………… 5, 14, 23, 24
  § 6268(a) ………………………………………………………24

**RULES AND REGULATIONS**

Federal Rules of Civil Procedure
  26(b)(5) ………………………………………………………17, 18
  34 ………………………………………………………………...16
  45(d)(2)(A) ……………………………………………………… 17
  45(d)(2)(B) …………………………………………………… 15, 16
  45(e)(2) ………………………………………………………...19
  45(e)(2)(A) …………………………………………………… 17, 18
  45(e)(2)(A)(i) ……………………………………………………17
  45(e)(2)(A)(ii) …………………………………………………17
  45(g) ……………………………………………………………... 15

MOT. TO COMPEL SUBPOENA COMPLIANCE (CAL. STATE ARCHIVES & DOJ)

## SUMMARY OF REQUEST

Via this motion, Williams & Cochrane, LLP respectfully requests that the Court compel the California Department of Justice and the California State Archives to comply with the subpoenas attached to the accompanying Declaration of Cheryl A. Williams as Exhibits 5 and 7, at least to the extent of producing all materials related to the 2016/17 compact negotiations with the Quechan Tribe of the Fort Yuma Indian Reservation that have thus far been withheld on the basis of privilege or confidence.[1] As is set forth in the Argument section of this brief, the basis for this request is both the insufficient responses to the subpoenas *and* the State's active involvement in the underlying litigation, which includes filing a ***636 page declaration*** and now agreeing to have multiple key witnesses testify about the subject matter of said litigation on June 2 & 3, 2020. *See* Argument, §§ I & II, *infra*. It is crucial that Williams & Cochrane receives access to the withheld documents prior to the dates of these depositions.

## INTRODUCTION

Williams & Cochrane, LLP ("Williams & Cochrane" or "Firm") won a rather momentous lawsuit against the State of California ("State") that enabled a federally-recognized Indian tribe to get out of a financially-onerous gaming compact under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq*., and recoup $36.3 million in its past "revenue sharing" payments as a form of restitution. *See Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation,* 813 F.3d 1155 (9th Cir. 2015). Just days after new outlets from around California reported on the State satisfying the $36.3 million judgment, another tribe from California known as the Quechan Tribe of the Fort Yuma Indian Reservation ("Quechan" or "Tribe") contacted Williams & Cochrane to inquire whether the Firm (on a predominantly contingency basis) could help the Tribe fix its own financially-burdensome compact – some ten or so years after its execution.[2] *See*

---

[1] This corresponds to request numbers 7 and 8 in the subpoenas for both the Department of Justice and the State Archives.

[2] The base information in the Introduction and Statement of Facts sections comes

1                     Misc. Case No.: _____

MOT. TO COMPEL SUBPOENA COMPLIANCE (CAL. STATE ARCHIVES & DOJ)

*Williams & Cochrane, LLP v. Quechan Tribe of Fort Yuma Indian Reservation et al.,* No.
17-01436, Dkt. No. 220, ¶ 49 GPC MSB (S.D. Cal. filed on July 17, 2017). Williams &
Cochrane agreed to do the work and over the course of the next nine months was able to
convince then Governor Edmund G. Brown, Jr. through his compact negotiator – *i.e.*,
someone who was intimately familiar with the *Pauma* case from his time previously serv-
ing as Chief Counsel for the California Gambling Control Commission – to provide Que-
chan with a replacement compact that not only eliminated all revenue sharing fees, but
also increased its permitted number of casinos from 1 to 3 and slot machines from 1,110
to 1,600. *See* Dkt. No. 220, ¶ 107. And yet, just three days before Quechan was supposed
to sign this replacement compact, the putative President of Quechan sent a letter to Wil-
liams & Cochrane to inform the Firm he was "terminating the services of Williams &
Cochrane, LLP… effective immediately upon your receipt of this letter" and the Tribe
would "not pay any contingency fee or 'reasonable free for the legal services provided in
lieu thereof.'" Dkt. No. 220, Ex. 4. If this were not enough, the putative President of Que-
chan then demanded the final draft of the replacement compact so a successor attorney
could swoop in and obtain the requisite signatures, and then told Williams & Cochrane
that it could not discuss the situation with *anyone* affiliated with the Tribe under threat to
ruin "the reputation of your firm in Indian Country and the State of California." Dkt. No.
220, Ex. 4.

   This rather bizarre series of events culminated with Williams & Cochrane turning
over the final draft compact and subsequently filing the underlying federal-question case
in which the Firm has breach of contract and breach of the implied covenant of good faith
and fair dealing claims against Quechan and a false advertising claim under the Lanham
Act, 15 U.S.C. § 1051 *et seq.*, against the successor attorney for brazenly claiming that
he, in actuality, "successfully litigated" the *Pauma* case that helped Williams & Cochrane

from Williams & Cochrane's Fourth Amended Complaint in the underlying action at
Docket Number 220, materials obtained during discovery in the underlying action, and
background case law.

Misc. Case No.: _____
MOT. TO COMPEL SUBPOENA COMPLIANCE (CAL. STATE ARCHIVES & DOJ)

obtain the Quechan work in the first place. Dkt. No. 220, pp. 58-64. Trying to piece together a defense to a claim of a bad faith breach that occurred just days before the end of the negotiations is tough sledding, so counsel for Quechan reached out to the State to inquire whether it would throw its hat into the ring and come to the Tribe's defense in the case. Seemingly still sore about his role in helping the State lose out on hundreds of millions of dollars in revenue sharing as a result of the *Pauma* decision, the State's negotiator agreed to get involved and to that end filed a ***636 page declaration*** in which he testified about virtually every subject conceivably related to the Quechan compact negotiations. *See* Williams Decl., Ex. 1. For instance, take Paragraph 19 of this declaration that tries to explain the State was not prepared to sign the replacement compact at the point in time that Quechan terminated Williams & Cochrane because, first and foremost, it was missing a map exhibit that ultimately was not even included as part of the executed compact:

> 19. At the time I received [the letter from Quechan indicating Williams & Cochrane was terminated], there were significant unresolved substantive and procedural issues relating to the compact, including the location of the land that would be eligible for gaming pursuant to the compact and a map to reflect that land, the underpayment dispute described in paragraph 9 above, and agreed-upon payment mechanism, and agreement on final language. We also had not yet verified, as we are required to do, that the Quechan President had the authority to execute the compact and to agree to the compact's limited waivers of sovereign immunity. The document also had not yet undergone the detailed review that must be performed by the Indian and Gaming Law Section and the attorneys for the tribe before any compact is executed to ensure internal consistency, clarity, accuracy, and similar matters before a compact is ready for execution. …

Williams Decl., Ex. 1 at ¶ 19.

What is even more startling than the sight of a 636 page declaration is how it came about. As hinted at above, Williams & Cochrane just recently learned through discovery that counsel for both Defendants in the underlying action had multiple phone calls with the State's negotiator *and* his legal representatives at the Department of Justice (*i.e.*, Sara Drake, amongst others) about the Quechan compact negotiations. *See* Williams Decl., Ex.

Misc. Case No.: _____

MOT. TO COMPEL SUBPOENA COMPLIANCE (CAL. STATE ARCHIVES & DOJ)

4 at pp. 1-2. As a result of these phone calls, counsel for Quechan sent the State's negotiator a skeletal outline of his ultimate declaration "that outlines the facts that we [at Quechan] would consider relevant and helpful in a declaration from you" – the same facts that presumably were the subject of the multiple phone calls between the State and counsel for the Defendants during the weeks prior. Williams Decl., Ex. 4 at p. 3. And again, this five-page draft declaration runs the gamut, delving into everything from the "State's [initial] November 9, 2016 meeting with the Tribe and [Williams & Cochrane]," to the "state of negotiations in June 2017 [at the time Williams & Cochrane was terminated]," to the events that transpired afterwards. Williams Decl., Ex. 4 at pp. 4-8. Once in the State's hands, the draft of this declaration then went on a traveling roadshow across the State from one attorney in the Department of Justice to the next, starting with Ms. Drake in the Sacramento office, then going to Sharon O'Grady in San Francisco, then implicating T. Michelle Laird in San Diego, and finally returning back to Sacramento and receiving input from one Jennifer Henderson. *See* Williams Decl., Ex. 4 at pp. 9-11. In other words, the act of drafting this single declaration for the State's negotiator was some sort of inter-office Bacchanalia in which attorneys from around California gleefully participated and helped craft what the State's negotiation team thought about the Quechan compact negotiations at all of the relevant points in time.

Again, the creationary backstory of this 636 page declaration was unknown to counsel for Williams & Cochrane for much of discovery, but its presence on the docket was enough for the Firm to send out document subpoenas to the State's negotiator, the California Department of Justice (*i.e.*, legal counsel for the State's negotiator), and the State Archives (*i.e.*, the current repository of the State's negotiator's files). *See* Williams Decl., Exs. 5-7. What came next was largely an exercise in futility orchestrated by a single deputy attorney general (*i.e.*, Jerry Yen) assigned to represent all three entities in connection with the subpoenas. *See* Williams Decl., Exs. 8-10. For the subpoena to the State's negotiator, the "objections and response" made it clear that this individual "does not have any non-confidential and non-privileged documents that are relevant to this

Misc. Case No.: _____

MOT. TO COMPEL SUBPOENA COMPLIANCE (CAL. STATE ARCHIVES & DOJ)

action and responsive to this Request in [his] possession, custody or control." Williams Decl., Ex. 9 at pp. 3-14. Subsequent conversations with Mr. Yen disclosed that the above response could have just struck out the non-confidential and non-privileged language, as it was suggested that any materials related to the Quechan compact negotiations that were once in the State's negotiator's personal possession have since been "destroyed." Williams Decl., ¶ 13. As for the objections and responses to the other two subpoenas to the Department of Justice and State Archives, both recite broad claims of privilege and then rely on the sort of "subject to and without waiving the foregoing" response language that the federal courts have long decried for its failure to give the propounding party reasonable notice of what is actually being withheld. *See, e.g., Herrera v. AllianceOne Receivable Mgmt.,* 2016 U.S. Dist. Lexis 40474, *9 (S.D. Cal. 2016) (stating that "'subject to' and 'without waiving objections' preserve… nothing and serve… only to waste the time and resources of both the Parties and the Court." (quoting *Consumer Elec. Ass'n v. Compras And Buys Magazine, Inc.,* 2008 U.S. Dist. Lexis 80465 (S.D. Fla. 2008))). The follow-up meet and confer with Mr. Yen did not provide much clarity on the individual documents being withheld under the subpoenas because he refused to prepare a privilege log for either the Department of Justice or State Archives; but, he did at least reveal two things on which the State absolutely will not budge: (1) the Department of Justice will continue to assert privilege with respect to all of its internal communications and its communications with the Office of the Governor (the State's negotiator included), and (2) the State Archives will continue to assert the state-based confidence set forth in Section 6268 of the California Government Code. *See* Cal. Gov't Code § 6268 (explaining a departing governor may restrict public access to his transferred files for a period of up to fifty years).

Yet, there is ample reason to believe that the State has waived *all* of the foregoing privileges on account of both its vague and inadequate responses to the subpoenas as well as its intensive involvement in the underlying action. And this involvement does not simply encompass the matters mentioned above of discussing the entirety of the Quechan

compact negotiations with counsel for the Defendants and then preparing a 636 page declaration on the subject. Rather, both the State's negotiator and his legal counsel Ms. Drake have agreed to appear at depositions that are currently scheduled for June 2nd and 3rd, respectively, in order to testify even further about the State's perception of the Quechan compact negotiations. *See* Williams Decl., Exs. 2-3. What is more, they are seemingly doing this of their own volition and without the issuance of deposition subpoenas, thus making it procedurally impossible for Williams & Cochrane to seek appropriate relief before the Eastern District of California in the event the Firm does not obtain the "privileged" evidence withheld under the subpoenas prior to the dates of the depositions. Given this, Williams & Cochrane respectfully requests that the Court resolve this motion to compel in advance of the scheduled depositions and, as part of that, order the Department of Justice and the State Archives to comply with the subpoenas attached to the accompanying Declaration of Cheryl A. Williams, at least to the extent they seek documents concerning the Quechan compact negotiations that have been withheld on the basis of either privilege or confidence.

## STATEMENT OF FACTS

Williams & Cochrane is a California law firm that represents federally-recognized Indian tribes generally and with respect to issues under IGRA. *See* Dkt. No. 220, ¶ 10. IGRA is a statutory scheme that permits a tribe to engage in high-stakes gambling like slot machines and house-banked card games on, *inter alia*, the condition that it first executes a "compact" with the surrounding state that lays out the regulatory terms for the operation of such games. *See* 25 U.S.C. § 2710(d)(1)(C). As one may expect, this compacting process has been fraught with problems since the inception of IGRA on account of states doing things like refusing to negotiate for legal games or trying to impose taxes upon tribes for the right to operate such statutorily-mandated games, the prohibitory language in the statute notwithstanding. *See* 25 U.S.C. § 2710(d)(4) ("[N]othing in this section shall be interpreted as conferring upon a State or any of its political subdivisions authority to impose any tax, fee, charge, or other assessment upon an Indian tribe or upon

Misc. Case No.: _____
MOT. TO COMPEL SUBPOENA COMPLIANCE (CAL. STATE ARCHIVES & DOJ)

1  any other person or entity authorized by an Indian tribe to engage in a class III activity.").

2  Relations have been particularly sour in the State of California over the past twenty

3  years due in large part to the manner in which the State drafted the inaugural form

4  compact in the fall of 1999 that it executed with sixty-plus Indian tribes. *See Cachil Dehe*

5  *Band of Wintun Indians of Colusa Indian Cmty. v. California,* 618 F.3d 1066, 1068 & n.1

6  (9th Cir. 2010) ("*Colusa II*"). Rather than explicitly state the number of slot machines

7  each tribe could operate, this initial form compact tied together the rights of all signatory

8  tribes by explaining they had to compete against each other to acquire some of a limited

9  and ill-defined supply of slot machine licenses, the corpus of which is equivalent to the

10  output of the following formula in the compact:

> The maximum number of machines that all Compact Tribes in the aggregate
> may license pursuant to this Section shall be the sum equal to 350 multiplied
> by the number of Non-Compact Tribes as of September 1, 1999, plus the
> difference between 350 and the lesser number authorized under Section
> 4.3.1.

14  *Id.* at 1071. More than two years into the life of the compacts, the State finally interpreted

15  this language for the first time, explaining it provided for 32,151 licenses and advising

16  tribes they would have to amend their compacts should they desire to acquire further

17  licenses once this slot machine limit was reached. *See id.* As it turned out, these amend-

18  ment discussions centered upon money, as the State sought significantly more "revenue

19  sharing" than it did under the original compacts. As just one example, the State offered

20  the Rincon tribe an amended compact that would increase its number of slot machines

21  from 2,000 to 2,500, but the financial terms of the offer were so one-sided that "Rincon

22  stood to gain [just] $2 million in additional revenues" under the terms of the proposed

23  amendment while "the State stood to gain $38 million." *Rincon Band of Luiseno Mission*

24  *Indians of Rincon Reservation v. Schwarzenegger,* 602 F.3d 1019, 1025-26 (9th Cir.

25  2010). In the perfect world, these amendment discussions would have never taken place,

26  though, as the federal courts declared that the total number of slot machine licenses avai-

27  lable under the compacts was actually 8,050 higher than what the State maintained while

administering the system. *See Colusa II,* 618 F.3d at 1082.

One of the tribes that ended up unnecessarily amending its compact to obtain additional slot machine licenses was the Pauma Band of Mission Indians, which saw its revenue sharing fees to the State increase by 2,460% in turn. *See Pauma,* 813 F.3d at 1162. Williams & Cochrane represented Pauma in the subsequent federal lawsuit to undo the effects of this amendment, and successfully obtained a judgment for the Tribe in 2014 from the Southern District of California that rescinded the amended compact and awarded $36.3 in restitution to atone for the excess revenue sharing fees paid under that agreement. *See Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California,* No. 09-01955 CAB MDD (S.D. Cal. 2017). After entry of judgment, Williams & Cochrane then represented Pauma on appeal to the United States Court of Appeals for the Ninth Circuit, on petition to the Supreme Court of the United States, and during post-judgment enforcement proceedings back before the district court. *See, e.g., California v. Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation,* No. 15-1185 (U.S. 2016).

The payment of the $36.3 million judgment by the State of California during the fall of 2016 garnered a lot of media attention in and around California, as it was easily the largest monetary award a state ever had to pay to a tribe since the enactment of IGRA. *See* Dkt. No. 220, ¶ 45. Shortly after the publicization of the judgment, another federally-recognized tribe in the State of California known as Quechan reached out to Williams & Cochrane to inquire whether the Firm could fix its own financially-burdensome amended compact – some ten-plus years after its execution. *See id.* ¶ 49. What followed next is that Williams & Cochrane agreed to do the work and the parties – at the behest of Quechan's Tribal Council – executed a largely contingency-based contract that would require the Tribe to pay the Firm a certain percentage of any revenue-sharing reduction the Tribe received under a replacement compact if the Firm was somehow able to resolve the situation expediently through negotiations. *See id.* at ¶ 60. As it turns out, Williams & Cochrane did just that, obtaining for Quechan a replacement compact that wiped out *all* reven-

Misc. Case No.: _____

MOT. TO COMPEL SUBPOENA COMPLIANCE (CAL. STATE ARCHIVES & DOJ)

ue sharing fees aside from the modest amount necessary to cover the State's regulatory costs and even went one step (or four steps) further – increasing the permitted number of casinos from 1 to 3 and the permitted number of slot machines from 1,100 to 1,600. *See id.* at Exs. 12 & 14.

However, just three days before Quechan was supposed to sign the final agreement, the putative President of the Tribe sent Williams & Cochrane a letter explaining that he was "terminating the services of Williams & Cochrane, LLP… effectively immediately upon your receipt of this letter," and that "[t]he Tribe will not pay any contingency fee or 'reasonable fee for the legal services provided in lieu' thereof." *See* Dkt. No. 220, Ex. 4. The putative President then advised Williams & Cochrane to simply walk away from the total breach, stating that he "strongly advise[d] you against pressing your luck further out of concern for the reputation of your firm in Indian Country and in the State of California." *Id.* He also forbid Williams & Cochrane from mentioning the situation to any "employee, officer, or official… or any subdivision, agency, or enterprise of the Tribe," and instructed the Firm to turn over the final compact and "direct all [other] communications regarding this matter to [another attorney by the name of] Robert A. Rosette." *Id.* To explain, Mr. Rosette is none other than the head partner of a law firm at which the partners of Williams & Cochrane worked for a brief period of time some seven-plus years prior. *Id.* at ¶ 13. As it happens, at the same time the putative President of Quechan was contemplating a way out of paying the contingency fee, Robert Rosette was advertising on his firm website that he was actually responsible for "successfully litigat-[ing]" the *Pauma* case that served as the basis for Williams & Cochrane obtaining the Quechan work in the first place. *Id.* at ¶ 47. This advertisement is, of course, literally, patently, unequivocally, and outrageously false.

Just days later, Williams & Cochrane turned over the final version of the draft compact it had negotiated to Quechan, and the Tribe and the State of California subsequently executed a nearly identical compact shortly thereafter. *See* Dkt. No. 220, ¶¶ 106-07. As this process was playing out, Williams & Cochrane filed the underlying action,

Misc. Case No.: _____

MOT. TO COMPEL SUBPOENA COMPLIANCE (CAL. STATE ARCHIVES & DOJ)

and presently has pending breach of contract and breach of the implied covenant of good faith and fair dealing claims against Quechan, and a false advertising claim under the Lanham Act against Mr. Rosette and his law firm(s). After being served with the complaint in this case, the two groups of defendants quickly sought out and hired two of the largest law firms in the United States, with Quechan retaining Wilmer Cutler Pickering Hale and Dorr LLP and Mr. Rosette retaining O'Melveny & Myers LLP. The defendants then claim to have entered into a joint defense agreement, and have proceeded to act (or not act, as the case may be) in unison during their efforts to litigate this action. The first instance of this was filing concerted anti-SLAPP motions early in the case claiming that the various contract-related claims in the original complaint somehow infringed the "defendants' constitutionally protected exercise of free speech, including 'the fundamental right of a client to choose and change his legal representations.'" *See* Dkt. Nos. 30-1, p. 5; 31-1. When Williams & Cochrane amended around these motions, the Defendants resorted to Plan B and filed an assortment of responsive motions that relied heavily upon a 636 page declaration from the negotiator for the State during the course of the Quechan negotiations. *See* Dkt. No. 50-4; Williams Decl., Ex. 1.

In terms of contents, this declaration by the State's negotiator contains seven pages of testimony and 629 pages of exhibits that are comprised exclusively of documents exchanged between Quechan and the State during Williams & Cochrane's representation of the Tribe. *See* Williams Decl., Ex. 1. Remarkably, there is nothing that comes afterwards, nor is there anything internal on the State's end. Despite this, the declaration not only testifies about supposedly all of the material events in the compact negotiations from the State's perspective, but it makes a significant number of legal or factual conclusions that can only be adjudged true or false by reviewing evidence wholly within the possession of the State. For instance, in Paragraph 8, the State's negotiator makes an unsubstantiated claim that the original draft compact obtained by Williams & Cochrane for Quechan is based upon other ones offered to different tribes in the State:

8. Attached hereto as Exhibit C is a true and correct copy of a cover

MOT. TO COMPEL SUBPOENA COMPLIANCE (CAL. STATE ARCHIVES & DOJ)

letter and a discussion-draft class III gaming compact we sent to President Jackson in care of Williams & Cochrane on December 7, 2016. The draft contains terms similar to those contained in compacts the State has entered into with other tribes.

Williams Decl., Ex. 1, ¶ 8. Then, in Paragraphs 11 and 12, the State's negotiator discusses when he learned about a supposed change in the Presidency at Quechan during the course of Williams & Cochrane's representation of the Tribe, and his recollection (or lack thereof) of what the Firm believed about that change in leadership and whether the putative President had the requisite authority to act on behalf of the Tribe:

11.  In early March, 2017, following the December, 2016 new Tribal Council election, Mr. Jackson resigned as tribal President and Keeny Escalanti, Sr. became Quechan's new President. I learned of the change on or about March 30, 2017. … As we continued to negotiate Quechan's compact with Williams & Cochrane, I do not recall either Ms. Williams or Mr. Cochrane expressing any doubt or concern regarding the Tribal Council's or President Escalanti's authority to act on behalf of the Tribe.

Williams Decl., Ex. 1, ¶¶ 11-12. And from there, in Paragraph 19, the State's negotiator then goes on to detail his perception about the status of the compact negotiations at the time of Williams & Cochrane's termination, and whether the State's negotiation team was prepared to finalize and sign the negotiated compact:

19. At the time I received that letter, there were significant unresolved substantive and procedural issues relating to the compact, including the location of the land that would be eligible for gaming pursuant to the compact and a map to reflect that land, the underpayment dispute described in paragraph 9 above, an agreed-upon payment mechanism, and agreement on final language. We also had not yet verified, as we are required to do, that the Quechan President had the authority to execute the compact and to agree to the compact's limited waivers of sovereign immunity. The document also had not yet undergone the detailed review that must be performed by the Indian and Gaming Law Section and the attorneys for the tribe before any compact is executed, to ensure internal consistency, clarity, accuracy and similar matters before a compact is ready for execution.

Williams Decl., Ex 1, ¶ 19.

And yet, it turns out that this declaration was not a creature of the State's own

MOT. TO COMPEL SUBPOENA COMPLIANCE (CAL. STATE ARCHIVES & DOJ)

making according to evidence obtained during discovery. As to that, in February 2018, counsel for Rosette in the underlying action contacted the State's negotiator and his legal counsel Ms. Drake to discuss the case. Williams Decl., Ex. 4 at p. 1. Following this initial phone call, counsel for Rosette sent a follow-up e-mail in which he suggested that the foregoing representatives of the State speak with both he and counsel for Quechan about the Tribe's compact negotiations in order to at least go over certain "allegations made by Williams & Cochrane in the case… and factual information we are trying to nail down." Williams Decl., Ex. 4 at p. 1. Ms. Drake was the first to respond, sending an e-mail later the same day that simply said, "That works for me." Williams Decl., Ex. 4 at p. 1. About ten minutes later, the State's negotiator sent a response e-mail of his own stating that he "[s]hould be able to make it work" and that he "also need[s] to check in with Legal." Williams Decl., Ex 4 at p. 3.

This second call ultimately went forward and out of it came an e-mail from counsel for Quechan to the State's negotiator that attached a "document that outlines the facts that we would consider relevant and helpful in a declaration from you." Williams Decl., Ex. 4 at p. 3. Fingering the State's negotiator as the desired witness was an intentional choice on the part of counsel for Quechan, as "[g]iven [Williams & Cochrane's allegations], we think it probably makes the most sense for a declaration to come from you rather than Sarah [sic] [Drake]." Williams Decl., Ex. 4 at p. 3. As for the structure of the outline for the proposed declaration, it included bracketed text in the various numbered paragraphs to identify the matters the parties presumably discussed during the prior phone calls and for which counsel for Quechan wanted testimony from the State's negotiator in the end product. *See* Williams Decl., Ex. 4 at pp. 4-8. For example, in Paragraph 20, counsel for Quechan lays out the desired testimony on the state of the negotiations at the time of Williams & Cochrane's termination (*i.e.*, what ultimately became Paragraph 19), which provides in material part:

> The process for drafting the compact revisions was not complete by June 21, 2017, and the compact was not ready for signature by the end of June 2017.

> Even if negotiations of substantive terms had concluded – and they had not – there would have been some additional time required to address the formalities required to finalize all compacts, described above in paragraph [6]. Thus, the State was simply not in position to sign a draft compact at the end of June 2017 and had no intent to do so.

Williams Decl., Ex. 4, p. 7. With the outline for the declaration for the State's negotiator in hand, the State then sent it on to a deputy attorney general in the San Francisco office by the name of Sharon O'Grady. Williams Decl., Ex. 4 at p. 9. Ms. O'Grady then helped author the ultimate declaration with the apparent help of any number of other figures in the Office of the Governor and the Department of Justice – including the State's negotiator, Governor Brown's Legal Affairs Secretary Peter Krause, Ms. Drake, Michelle Laird from the San Diego office, and Jennifer Henderson from the Sacramento office, amongst others – before sending it on to counsel for Quechan for use in the underlying case. *See* Williams Decl., Ex. 4 at pp. 3, 11.

Before it had any awareness of the State's extensive communications with counsel for the Defendants about the subject matter of the underlying suit, counsel for Williams & Cochrane served document subpoenas on the State's negotiator, the Department of Justice, and the State Archives in order to obtain materials relevant to the suit. *See* Williams Decl., Exs. 5-7. For example, each one of these subpoenas sought "All DOCUMENTS and COMMUNICATIONS within your possession, custody, or control RELATED TO or CONCERNING the QUECHAN COMPACT NEGOTIATIONS, expressly including the legislative ratification (with the California legislature) and the federal approval (with the United States Department of the Interior – Bureau of Indian Affairs) processes." Williams Decl., Ex. 5. All three of these subpoenas were assigned to and handled by a single deputy attorney general named Jerry Yen. As for the subpoena to the State's negotiator, the response indicated that he does not have any relevant materials in his possession, a position Mr. Yen would subsequently reaffirm during the meet and confer process by explaining that any materials in the State negotiator's personal possession related to the Quechan compact negotiations would have been "destroyed" at some point. Williams

Misc. Case No.: _____

MOT. TO COMPEL SUBPOENA COMPLIANCE (CAL. STATE ARCHIVES & DOJ)

1   Decl., ¶ 13.

2   As for subpoenas to the Department of Justice and State Archives, the responses

3   employ a standard format in which various privilege-based objections are recited and

4   then a conclusion is stated that uses an opening "[s]ubject to and without waiving the

5   foregoing objections" clause. *See* Williams Decl., Exs. 8 & 10. For instance, in response

6   to the aforesaid request for materials on the Quechan compact negotiations, the Depart-

7   ment of Justice responded that it "objects to this Request to the extent it seeks documents

8   protected from disclosure by the attorney-client privilege, work product privilege, confi-

9   dentiality agreements, or any other applicable privilege or protection," and then continues

10   on to say "[s]ubject to and without waiving the foregoing objections, DOJ responds that,

11   to the extent they exist, it will produce non-confidential and non-privileged documents

12   that are relevant to this action and responsive to this Request in its possession, custody, or

13   control." Williams Decl., Ex. 8 at p. 7. The State Archives used the exact same format for

14   its response to the Quechan-compact-negotiations request, save for adding "California

15   Government Code section 6268" to the list of "privileges or protection[s]" to which the

16   response is subject. Williams Decl., Ex. 10 at p. 7. During the ensuing meet and confer,

17   counsel for Williams & Cochrane tried to get Mr. Yen to agree to prepare a privilege log

18   so they had some idea of what fell under the heading of the vague privilege invocations

19   that ended with the "any other applicable privilege or protection" catch-all, but he flatly

20   refused. *See* Williams Decl., Ex. 11, p. 11. However, Mr. Yen did disclose that (1) the

21   Department of Justice will unequivocally assert privilege over its communications that

22   are either in-house or with the Office of the Governor, and (2) the State Archives will

23   similarly protect most all of its responsive records under Section 6268 of the Government

24   Code. Williams Decl., ¶ 13.

25   As counsel for Williams & Cochrane was in the midst of weeks of working with

26   Mr. Yen on the subpoena responses, counsel for Quechan served notices for the deposi-

27   tions of the State's negotiator and Ms. Drake, which are currently scheduled for June 2nd

28   and June 3rd, respectively. Williams Decl., Exs. 2 & 3. No subpoenas were issued in con-

nection with the deposition notices, which makes it appear as if the two State officials are simply planning to show up voluntarily as if they are parties to the litigation. Williams Decl., Exs. 2 & 3.

## LEGAL STANDARD

Federal Rule of Civil Procedure 45 "'explicitly contemplates the use of subpoenas in relation to non-parties' and governs subpoenas served on a third party… as well as motions to quash or modify or to compel compliance with such a subpoena." *Am. Fed'n of Musicians v. Skodamn Films, LLC,* 313 F.R.D. 39, 42 (N.D. Tex. 2015) (quoting *Isenberg v. Chase Bank USA, N.A.,* 661 F. Supp. 2d 627, 629 (N.D. Tex. 2009)). Under Rule 45, a nonparty served with a subpoena has fourteen days in which to respond to the subpoena, save for when it seeks assistance from a federal district court in a "timely" manner. *See Moon v. SCP Pool Corp.,* 232 F.R.D. 633, 636 (C.D. Cal. 2005). There are actually four different ways in which the nonparty can respond. *See MetroPCS v. Thomas,* 327 F.R.D. 600, 608 (N.D. Tex. 2018). The first is to simply "ignore the subpoena," which is far and away the "worst option, and almost certain to result in a contempt citation under Rule 45(g) and a finding that all objections have been waived." *Id.*; *see Forsythe v. Brown,* 281 F.R.D. 577, 588-89 (D. Nev. 2012) (explaining that withholding documents on instructions of the principal is no defense to failing to comply with or object to the subpoena). "Second, the non-party may comply with the subpoena, an option that appears to be less frequently chosen in these contentious times." *Id.* Third, the nonparty can shoulder the burden of seeking outside recourse by filing a motion to modify or quash the subpoena with a federal district court, so long as, once again, it does so in a "timely" manner. *Id.*; *see Duplantier v. Bisso Marine Co.,* 2011 U.S. Dist. Lexis 70548, *7 (E.D. La. 2011) (finding a motion to quash untimely when it was filed "fifteen (15) days after the final day in which to serve objections"). Finally, the nonparty "may serve on the party or attorney designated in the subpoena a written objection to inspection, copying, testing, or sampling any or all of the materials or to inspecting the premises – or to producing electronically stored information in the form or forms requested." *Id.* (citing Fed. R. Civ.

P. 45(d)(2)(B)). This final option of serving objections tends to be the favored option of responding for nonparties, as it is a "less formal, easier, usually less expensive method of forestalling subpoena compliance when compared to the separate option of filing a motion to quash or modify the subpoena." *Id.*

However, objecting to a subpoena must be done in accordance with the all-too-familiar rules. Generally speaking, "courts often conclude that a non-party's objections under Rule 45(d)(2)(B) 'should be subject to the same requirements facing a party objecting to discovery under Rule 34,' including 'the same prohibition on general or boiler-plate objections and requirements that the objections must be made with specificity." *A&F Bahamas, LLC v. World Venture Group, Inc.,* 2018 U.S. Dist. Lexis 224399, *10 (C.D. Cal. 2018) (citing *Am. Fed'n of Musicians,* 313 F.R.D. at 46); *see Ceuric v. Tier One, LLC,* 325 F.R.D. 558, 561 (W.D. Pa. 2018) (indicating that objections that do not show "'specifically how each [request] is not relevant or how each question is overly broad, burdensome, or oppressive' [are] inadequate to 'voice a successful objection'" (citing *Heller v. City of Dallas,* 303 F.R.D. 466, 483-84 (N.D. Tex. 2014))). What this means is that that objections pertaining to particular subpoena requests must be "plain enough and specific enough so that the court can understand in what way [the discovery sought is] alleged to be objectionable." *Ctr. for Indiv. Rights v. Chevaldina,* 2017 U.S. Dist. Lexis 195871, *10 (S.D. Fla. 2017). And in keeping with this standard, for claims of privilege general statements asserting "'confidentiality,' attorney-client privilege or [the] work product doctrine" simply do not suffice. *Id.* at *11 (citing, *e.g.*, *Guzman v. Irmadan, Inc.,* 249 F.R.D. 399, 401 (S.D. Fla. 2008)).

## ARGUMENT

I. **THE DEPARTMENT OF JUSTICE AND STATE ARCHIVES WAIVED PRIVILEGE BY THE VAGUE MANNER IN WHICH THEY STATED PRIVILEGE AND CONFIDENCE OBJECTIONS IN THEIR RESPONSES TO THE SUBPOENA REQUESTS**

The responses to the subpoenas by the State Archives and the Department of Justice are so vague and out of compliance with basic federal requirements that Williams &

1   Cochrane was left with no idea whether these entities were withholding documents or on

2   what basis they were doing so. The general standard under Rule is 45 is that "[a] person

3   withholding subpoenaed information under a claim that it is privileged or subject to

4   protection as trial-preparation material must expressly make the claim; and describe the

5   nature of the withheld documents … in a manner that, without revealing information

6   itself privileged or protected, will enable the parties to assess the claim." Fed. R. Civ. P.

7   45(e)(2)(A)(i) & (ii); *see Ott v. City of Milwaukee,* 682 F.3d 552, 558 (7th Cir. 2012)

8   (finding "[t]he state agencies' brief and broad reservation of rights is insufficient to sat-

9   isfy this requirement" of Rule 45(d)(2)(A)). The federal courts have noted this language

10   is substantively identical "to Federal Rule of Civil Procedure 26(b)(5)'s requirement as to

11   a responding party" (*see Total Rx Case, LLC v. Great N. Ins. Co.,* 318 F.R.D. 587, 593-

12   94 (N.D. Tex. 2017) (citing Fed. R. Civ. P. 26(b)(5) & 45(e)(2)(A))), and accordingly

13   impose the same standard on a non-party objecting to a subpoena as they do a party that

14   is faced with a discovery request. *See Am. Fed'n of Musicians,* 313 F.R.D. at 46. What

15   this means is that the non-party must make specific objections that are "plain enough and

16   specific enough so the court can understand in what way the [discovery sought is] alleged

17   to be objectionable." *Chevaldina,* 2017 U.S. Dist. Lexis 195871 at *10 (quoting *Panola*

18   *Land Buyers Ass'n v. Shurman,* 762 F.2d 1550, 1559 (11th Cir. 1985)); *see Orix USA*

19   *Corp. v. Armentrout,* 2016 U.S. Dist. Lexis 100617, *5 (N.D. Tex. 2016) ("This means

20   that a non-party is subject to the requirements that an objection to a document request

21   must, for each item or category, state with specificity the grounds for objecting to the re-

22   quest, including the reasons, and must state whether any responsive materials are being

23   withheld on the basis of that objection."). As applied to claims of privilege, this principle

24   means that "[g]eneralized objections asserting 'confidentiality,' 'attorney-client privilege

25   or work product doctrine'" simply do not suffice. *Chevaldina,* 2017 U.S. Dist. Lexis

26   195871 at *11 (citing *Guzman,* 249 F.R.D. at 401). Rather, "[a] nonparty withholding

27   subpoenaed information on the grounds of privilege must" couple these objections with

28   an actual "privilege log describing the nature of the documents withheld so that the other

parties may assess the privilege claimed." *Boston Sci. Corp. v. Lee,* 2014 U.S. Dist. Lexis 107584, *13 (N.D. Cal. 2014); *Wallis v. Centennial Ins. Co.,* 2013 U.S. Dist. Lexis 14181, *26 (E.D. Cal. 2013) (explaining that under either Rule 45(e)(2)(A) or 26(b)(5) the "failure to submit a privilege log [is] improper" and a "blanket assertion of privilege fails to meet the[ ] burden on th[e] motion [to compel]"); *Heilman v. Vojkufka,* 2011 U.S. Dist. Lexis 26004, *51 (E.D. Cal. 2011) ("Refusal to produce discovery based on a blanket assertion of privilege and without a proper privilege log is not an appropriate response to the discovery request.").

Here, the subpoena responses from the Department of Justice and the State Archives incorporate the vaguest of vague privilege objections that the preparing attorney adamantly refused to clarify by preparing a privilege log. As an illustrative example, take request number seven in the subpoena to the Department of Justice that asked for "All DOCUMENTS and COMMUNICATIONS… RELATED TO or CONCERNING the QUECHAN COMPACT NEGOTIATIONS, expressly including the legislative ratification… and the federal approval processes." Williams Decl., Ex. 5 at p. 8. The response to this subpoena request began by reciting a series of exceptions and objections, the one relating to privilege explaining that the "DOJ… objects to this Request to the extent it seeks documents protected from disclosure by the attorney-client privilege, work product privilege, confidentiality agreements, or any other applicable privilege or protection." Williams Decl., Ex. 8 at p. 7.  From there, the actual response invoked the introductory "[s]ubject to and without waiving the foregoing objections" language that federal courts decry and then explained that the DOJ "will produce non-confidential and non-privileged documents that are relevant to this action and responsive to this Request in its possession, custody or control." *See Consumer Elec. Ass'n,* 2008 U.S. Dist. Lexis 80465 at *3 (explaining that "subject to" and "without waiving" objections" "preserve… nothing and serve… only to waste the time and resources of both the Parties and the Court"); *Sherwin-Williams Co. v. JB Collins Servs.,* 2014 U.S. Dist. Lexis 93368, *7 (S.D. Cal. 2014) ("Consequently, as to the responses that are made 'subject to' and 'without waiv-

Misc. Case No.: _____

MOT. TO COMPEL SUBPOENA COMPLIANCE (CAL. STATE ARCHIVES & DOJ)

ing the foregoing objections,' they are improper, the objections are deemed waived, and the response to the discovery requests stands." (collecting cases)).

Given the broad objection language, one is left to wonder what exactly is being produced under the response. Is the State still assuming the attorney-client and work product privileges are wholly intact despite its intensive involvement in the underlying litigation? Is the invocation of "confidentiality agreements" supposed to mean that one such agreement supposedly shields some otherwise non-privileged portion of the State's documents and communications on the Quechan compact negotiations? And what effect does the ending "any other privilege or protection" catch-all have on shielding documents that in the absence of such language would be prone to disclosure? Unfortunately, none of these questions received answers in the State's objections and responses, and the preparing attorney did little to shed any light on the subject in the aftermath. In the wake of receiving the subpoena responses, Williams & Cochrane sent letters to Mr. Yen on April 6, 2020 to inquire about the whereabouts of the privilege logs for the Department of Justice and State Archives that should be sent within a reasonable time of the respective subpoena responses. Williams Decl., Ex. 11 at p. 1. The April 15, 2020 response letter from Mr. Yen made it abundantly clear that no privilege logs would be forthcoming, as Rules 45(e)(2) supposedly only required the State to provide "a description of the nature of the withheld documents." Williams Decl., Ex. 11 at p. 11. Apparently, the descriptions within the subpoena responses were meant to suffice, the above case law notwithstanding. However, providing a barebones description is simply not the relevant standard under the Federal Rules, and the refusal to prove-up a nearly indecipherable privilege invocation means that this very non-specific objection has been waived and the State must comply with the Department of Justice and the State Archives subpoenas by turning over the supposedly privileged and confidential documents.

///

///

///

Misc. Case No.: _____

MOT. TO COMPEL SUBPOENA COMPLIANCE (CAL. STATE ARCHIVES & DOJ)

**II.**    **The State Further Waived Privilege by its Considerable Involvement in the Underlying Litigation, including its Submission of a 636 Page Declaration regarding its Perceptions of the Quechan Compact Negotiations, and its Assistance in Arranging the Depositions of Two Key Witnesses who Intend to Testify even Further on this Matter in the Near Future**

### A.    Making Voluntary Disclosures to Counsel for the Defendants

Whatever privilege remains after the State's insufficient subpoena responses disappears in light of its active participation in the underlying suit. One of the cardinal rules of privilege law is that the party claiming the privilege "bears the burden of establishing that the attorney-client privilege applies to the documents in question." *Leasure v. Willmark Cmtys., Inc.,* 2012 U.S. Dist. Lexis 136445 (S.D. Cal. 2012) (citing *Tornay v. United States,* 840 F.2d 1424, 1426 (9th Cir. 1988)). A natural corollary of this rule is that this party also then bears the burden of proving that privilege has not been waived when the subpoenaing party raises such argument. And, here, waiver occurred in at least three different ways. First, "[i]t is well established that voluntary disclosure of the content of an attorney-client communication waives attorney-client privilege as to all other communications on the same subject matter." *Aclara Biosceinces v. Caliper Techs. Corp.,* 2000 U.S. Dist. Lexis 10585, *12 (N.D. Cal. 2000) (citing *Weil v. Investment / Indicators,* 647 F.2d 18, 24 (9th Cir. 1981) ("When the (privilege holder's) conduct touches a certain point of disclosure, fairness requires that his privilege shall cease whether he intended that result or not. He cannot be allowed, after disclosing as much as he pleases, to withhold the remainder.")). As stated throughout this motion, counsel for the Defendants had multiple phone calls with the State's negotiator *and* his legal representative at the Department of Justice about the "factual information" and "allegations" pertinent to the underlying suit. Williams Decl., Ex. 4 at p. 1. What came out of these conversations was a proposed declaration from counsel for Quechan that was handpicked for the State's negotiator and presumably covered most everything that was discussed on the prior calls. *See* Williams Decl., Ex. 4 at pp. 4-8. For instance, there are claims that the compact Wil-

liams & Cochrane obtained for Quechan "was based on previously-negotiated compacts entered into by the State," that the Firm had not addressed the dispute regarding Quechan's past due revenue sharing payments, and that the State "was simply not in a position to sign a draft compact at the end of June 2017 and had no intent to do so." Williams Decl., Ex. 4 at pp. 5-7. What this means is that, during these phone calls, the State's negotiator made comments that were later incorporated into counsel for Quechan's proposed declaration (like the above) and Ms. Drake either chimed in and agreed or acquiesced in silence. Either way, the State's negotiator was revealing perceptions the State privately held regarding factual and legal matters related to the Quechan compact negotiations, and he was doing so in front of and with the consent of his legal counsel. This is easily enough to say that the State waived privilege by voluntarily disclosing everything about the Quechan compact negotiations to counsel for the Defendants.

**B.    Putting a Myriad of Subjects at Issue in the State's Negotiator's 636 Page Declaration**

Second, a similar waiver occurs if the holder of the privilege places a certain subject at issue in the litigation. *See Walters Wholesale Elec. Co. v. Nat'l Union Fire Ins. Co.,* 247 F.R.D. 593 (C.D. Cal. 2008); *United States v. Blizerian,* 926 F.2d 1285, 1292 (2d Cir. 1991) (explaining that tendering state of mind on legal issues waives privilege as to conversations with counsel). For this waiver, simply refer back to the prior subsection and consider how the claims in the draft declaration ultimately appeared in the declaration the State's negotiator filed in the underlying action. This is a relatively easy task since the contents do not change significantly. There is again the claim that terms in the initial draft compact secured by Williams & Cochrane are "similar to those contained in compacts the State has entered into with other tribes." Williams Decl., Ex. 1 at p. 3. And there is also the claim that the parties "were able to resolve the $4.2 million underpayment dispute" *after* Williams & Cochrane's termination, which, by deductive reasoning, means the State's negotiator believes in his heart of hearts that the dispute was *not* resolved prior to the Firm's departure. Williams Decl. Ex. 1 at p. 6. And then there is this,

a massive block of text relaying the State's negotiator's perception of the legal status of the negotiations at the time Williams & Cochrane was fired by the putative President of Quechan:

> 19. At the time I received that letter, there were significant unresolved substantive and procedural issues relating to the compact, including the location of the land that would be eligible for gaming pursuant to the compact and a map to reflect that land, the underpayment dispute described in paragraph 9 above, an agreed-upon payment mechanism, and agreement on final language. We also had not yet verified, as we are required to do, that the Quechan President had the authority to execute the compact and to agree to the compact's limited waivers of sovereign immunity. The document also had not yet undergone the detailed review that must be performed by the Indian and Gaming Law Section and the attorneys for the tribe before any compact is executed, to ensure internal consistency, clarity, accuracy and similar matters before a compact is ready for execution.

Williams Decl., Ex. 1 at p. 5. Make no mistake, this paragraph not only relays the *client's* perceptions of the legal status of the negotiations but even indicates where his *attorneys* stood on the issue given that they supposedly had not engaged in the "detailed review that must be performed… before any compact is executed." Williams Decl., Ex. 1 at. p. 5. Thus, amongst the many, many subjects the State has put at issue in the 636 page declaration of the State's negotiator is the subject of where the State stood on June 27, 2017 – the date Williams & Cochrane was blocked form winding up its work.

### C.    Scheduling Senior Assistant Attorney General Sara Drake to Testify at the Impending June 3, 2020 Deposition

Third and finally, a waiver also occurred as a result of what is about to happen with the State's negotiator and his legal counsel appearing at depositions to testify even further about the Quechan compact negotiations. One of the earliest applications of the voluntary disclosure doctrine relates to a client who puts or intends to put his attorney on the witness stand in order to testify to certain issues, and accordingly waives privilege with respect to all such issues. *Handgards, Inc. v. Johnson & Johnson,* 413 F. Supp. 926, 929 (N.D. Cal. 1976); *Shooker v. Superior Court,* 111 Cal. App. 4th 923, 930 (2d Dist. 2003) (explaining a waiver is effectuated if there is "reasonable certainty that the party will ac-

tually testify"). Here, at the same time Williams & Cochrane was working with Mr. Yen on trying to effectuate an informal resolution to the subpoena issue, the State's negotiator and his legal counsel Ms. Drake were covertly corresponding with counsel for Quechan about setting up their depositions. In fact, this process was strangely so amicable that counsel for Quechan was able to get them to agree to voluntarily show up for seven hour depositions without the issuance of subpoenas. Thus, there is more than just a reasonable certainty that Ms. Drake will testify; she appears ready to be there with bells on, which means the Department of Justice and State Archives need to produce whatever documents about the Quechan compact negotiations they are withholding on the basis of privilege or confidence prior to these depositions.

### III. THE STATE-LAW STATUTORY PROTECTION AFFORDED TO THE FILES OF OUT-GOING GOVERNORS IN SECTION 6268 OF THE CALIFORNIA GOVERNMENT CODE IS NOT MEANT TO APPLY IN LITIGATION OF *ANY* NATURE, LET ALONE FEDERAL QUESTION LITIGATION

Conversations with Mr. Yen that occurred after the service of the responses to the subpoenas revealed that the primary basis for the State Archives withholding Governor Brown's (and hence the State's negotiator as a consequence) files related to the Quechan compact negotiations is Section 6268 of the California Government Code. The text of this section, which is set forth below, essentially requires an outgoing Governor to transfer his or her files to the State Archives and also allows him or her to restrict access to such files for a period of up to fifty years:

> (a) Public records, as defined in Section 6252, in the custody or control of the Governor when he or she leaves office, either voluntarily or involuntarily, shall, as soon as is practical, be transferred to the State Archives. Notwithstanding any other law, the Governor, by written instrument, the terms of which shall be made public, may restrict public access to any of the transferred public records, or any other writings he or she may transfer that have not already been made accessible to the public. With respect to public records, public access, as otherwise provided for by this chapter, shall not be restricted for a period greater than 50 years or the death of the Governor, whichever is later, nor shall there be any restriction whatsoever with respect to enrolled bill files, press releases, speech files, or

writings relating to applications for clemency or extradition in cases which have been closed for a period of at least 25 years. Subject to any restrictions permitted by this section, the Secretary of State, as custodian of the State Archives, shall make all those public records and other writings available to the public as otherwise provided for in this chapter.

Cal. Gov't Code § 6268(a).

But, what is notable about this provision is that it is part of the California Public Records Act and, as such, it "shall not be deemed in any manner to affect … the rights of litigants … under the laws of discovery of this state." Cal. Gov't Code § 6260. In other words, this exemption set forth in Section 6268 that restricts access to files of prior gubernatorial administrations simply "do[es] not apply to the issue whether records are privileged *in pending litigation* so as to defeat *a party's* right to *discovery.*" *Marylander v. Superior Court,* 81 Cal. App. 4th 1119, 1125 (2d Dist. 2000) (citing *Shepherd v. Superior Court,* 17 Cal. 3d 107, 123-24 (1976)). To the extent this State-law privilege *could* get around this precedent and *could* apply in some sort of litigation, it still *could not* be used in this particular litigation since it involves a federal question claim and thus relies upon the federal law of privilege according to federal precedent. *Agster v. Maricopa County,* 422 F.3d 836, 839-40 (9th Cir. 2005); *see Wm. T. Thompson Co. v. Gen. Nutrition Corp.,* 671 F.2d 100, 104 (3d Cir. 1982) (holding that state law privileges do not apply when there are "federal law claims pleaded in the underlying actions").

**IV.   THE STATE HAS A LONG TRACK-RECORD OF FILING LENGTHY DECLARATIONS FROM COMPACT NEGOTIATORS IN INDIAN GAMING CASES WHILE CONCURRENTLY TRYING TO SHIELD THE UNDERLYING MATERIALS FROM DISCOVERY**

This vexing situation of the State filing a declaration from a key witness without turning over the underlying documents is not unique to Williams & Cochrane. The individual who served as the compact negotiator for the State during the formative years of compacting in California submitted an eighteen paragraph declaration about the meaning of the original compacts in a major federal lawsuit concerned with the interpretation of such agreements *after* the close of discovery and thus after the point in time when the ad-

24   Misc. Case No.: _____
MOT. TO COMPEL SUBPOENA COMPLIANCE (CAL. STATE ARCHIVES & DOJ)

versely affected tribes could try and obtain the documents that would prove or disprove this eleventh-hour testimony. *See Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California,* No. 04-02265 FCD KJN, Dkt. No. 95-2 (E.D. Cal. Mar. 19, 2009). This was no one-time thing, as the same compact negotiator submitted *another* declaration after the close of discovery in the *Pauma* litigation some five years later even though he refused to participate in discovery earlier in the case by claiming a perfectly-valid subpoena was not properly served. *See, e.g., Pauma,* No. 09-01955, Dkt. No. 254-1 (S.D. Cal. Jan. 23, 2014). And now, here is another declaration by a compact negotiator after the lapse of five more years, with the only difference being that the number of subjects covered by the declaration testimony has exponentially increased over time. For the State, this practice of catapulting boulders over the castle walls has gone on for more than ten years now, and this Court needs to bring it to an end by requiring the Department of Justice and State Archives to turn over the documents on the Quechan compact negotiations they have withheld on the basis of privilege or confidence.

## CONCLUSION

For the foregoing reasons, Williams & Cochrane respectfully requests the Court to compel the Department of Justice and the State Archives to comply with the subpoenas attached to the accompanying Declaration of Cheryl A. Williams by at least producing all materials related to the 2016/17 compact negotiations for the Quechan Tribe of the Fort Yuma Indian Reservation that have thus far been withheld on the basis of privilege or confidence.

RESPECTFULLY SUBMITTED this 13th day of May, 2020

WILLIAMS & COCHRANE, LLP

By: */s/ Kevin M. Cochrane*
Cheryl A. Williams
Kevin M. Cochrane
caw@williamscochrane.com
kmc@williamscochrane.com

25                    Misc. Case No.: _____
MOT. TO COMPEL SUBPOENA COMPLIANCE (CAL. STATE ARCHIVES & DOJ)

1

2

3

WILLIAMS & COCHRANE, LLP
125 S. Highway 101
Solana Beach, CA 92075
Telephone: (619) 793-4809

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Misc. Case No.: _____

MOT. TO COMPEL SUBPOENA COMPLIANCE (CAL. STATE ARCHIVES & DOJ)